J-S16001-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| WILLIAM PETERSON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANDREA B. RUSH | : | |
| | : | |
| Appellant | : | No. 1536 MDA 2024 |

Appeal from the Order Entered September 20, 2024
In the Court of Common Pleas of York County Civil Division at No(s):
2023-FC-002145-03

BEFORE:  LAZARUS, P.J., BOWES, J., and LANE, J.

MEMORANDUM BY LAZARUS, P.J.:                **FILED: JULY 1, 2025**

Andrea B. Rush (Mother) appeals, *pro se*, from the order, entered in the Court of Common Pleas of York County, granting Mother and Appellee William Peterson (Father) shared legal and physical custody of the parties' minor daughter (Child) (born September 2021).  After careful review, we affirm.

Father filed a complaint for custody against Mother in December 2023. On January 5, 2024, the trial court entered an interim custody order awarding Mother and Father shared legal and physical custody.  Pending the outcome of a drug and alcohol evaluation, Father's custody was ordered to be

supervised; paternal grandfather and grandmother were deemed to be the visitation supervisors for Father's periods of physical custody.[1]

On January 17, 2024, Mother filed a petition for special relief indicating that there "presently is a [f]inal [o]rder for [PFA] entered with the consent of the parties[] protecting Mother. Pursuant to the [f]inal PFA [o]rder, Father is to undergo a [d]rug and [a]lcohol [e]valuation[,] as well as participate in a [b]atterer's [i]ntervention program." Petition for Special Relief, 1/17/24, at 2 (unnecessary capitalization omitted). In her petition, Mother averred that Father previously had a substance abuse problem and that he had relapsed shortly before the parties separated. *Id.* at 4. Mother's petition also alleged that during the course of the parties' custody conciliation conference, Mother requested and paid for Father to submit to a hair follicle test before his first supervised period of custody. *Id.* Mother alleged that Father "manifestly refused to do the hair follicle test" but, instead, completed a urine test that showed elevated levels of creatine. *Id.* at 3-4. Mother alleged that due to the elevated levels of creatine, Father had "attempted to tamper with the results of the drug test." *Id.* at 3. Mother asked the court to suspend Father's right to physical custody until Father completed the ordered alcohol and drug evaluation. *Id.* Furthermore, Mother sought the court to: (1) direct Father to undergo a hair follicle test; (2) take a negative inference from any and all

_____

[1] The interim order also noted "[d]ue to the current Protection From Abuse [(PFA)] [o]rder limiting contact between the parties, as well as the allegations of abuse, mediation is not appropriate at this time." Interim Order for Custody, Pending Trial, 1/4/24, at 2 (unpaginated).

future refusals by Father to take ordered tests; (3) direct Father to pay Mother's counsel fees in the sum of $750.00, representing the costs to prepare and present the petition; and (4) order any other equitable relief deemed appropriate by the court. *Id.* at 5.

On January 24, 2024, the court entered an order stating that it would look further at the matters presented in Mother's petition at the parties' pretrial conference, but that it:

> does emphasize that the whole drug test in issue and drug and alcohol evaluation being done by [F]ather will be looked at very seriously, and there is a definite possibility that the [c]ourt will award attorney's fees in favor of [M]other at the pre-trial conference or at the trial. Further, the [c]ourt will take a negative inference from any and all [of F]ather's refusals to take tests, and the [c]ourt puts [F]ather on notice as to that.

Order, 1/24/24, at 2. On May 7, 2024, the court awarded Mother $750.00 in counsel fees after concluding that Father's earlier refusal to take a hair follicle test violated the conciliation order. The court also noted that on January 18, 2024, Father provided a hair follicle sample—albeit with a concerning positive result of amphetamines—and that it did not find Father's explanation about his elevated creatine levels on his prior urine test credible. *See Order*, 5/7/24, at 2-3.

On September 3, 2024, Father filed a contempt petition against Mother, alleging that she had intentionally and willfully violated the court's interim custody order by having him forfeit his weekend with Child when Mother told Father last minute that a third-party visitation exchange facilitator was unavailable. Following a contempt hearing, held on September 10, 2024, the

court granted Father's petition, concluding that "Mother did willfully withhold the Child from Father during the said custody weekend." Contempt Order, 9/20/24, at 2.

On September 20, 2024, following a custody trial, the Honorable Steven D. Stambaugh[2] issued a final custody order granting Mother and Father 50/50 physical and legal custody of Child on a "2/2/3" schedule.[3] **See** Trial Court Final Custody Order, 9/20/24, at 1. In the final order, the court included the following disclaimer:

> Again, the [c]ourt incorporates all of the provisions of its Opinion in Support of Custody, but most specifically Mother's instructions that she must start to correct the record on child abuse reports so that it accurately reflects the known situation with Father, accurately reflects the existing [PFA], accurately reflects the fact that this [c]ourt finds no concerning drug use or addiction, [and] accurately reflects Mother's acknowledgment in court today through her counsel that she has no concerns regarding sexual abuse. The time for Mother's weaponization of the PFA, ICC[,] and child abuse processes ends today.

**Id.**, 9/20/24, at 3. Moreover, in its accompanying opinion in support of its final custody order, the court stated:

> I am, therefore, going to order Mother that, to the extent that she has concerns over child abuse, obviously any concerns regarding

---

[2] Effective October 9, 2024, Judge Stambaugh was suspended by order of the Commonwealth of Pennsylvania Court of Judicial Discipline. Judge Stambaugh's suspension is unrelated to his actions as a judge on the bench. For purposes of appeal, the matter was reassigned to the Honorable Kelley L. Margetas.

[3] Pursuant to the final order, Father shall always have physical custody of Child on Mondays and Tuesdays and Mother shall always have custody on Wednesdays and Thursdays. **See** Order, 9/20/24, at 2.

child abuse need to be reported to authorities, but they must now be reported with a disclaimer [(Disclaimer)]: "The [c]ourt made a finding of fact at the conclusion of a one-day trial on September 10, 2024, that Mother has intentionally weaponized the PFA, I[ndirect] C[riminal] C[ontempt], and child abuse process[es] in an effort to gain an advantage in custody proceedings." Mother should then further inform the providers that: "Nevertheless, all legitimate allegations or concerns of child abuse should be fully investigated as required by law." I am ordering Mother to make those two statements in any further child abuse reports so that a proper context is had.

\* \* \*

The [c]ourt is concerned and has made findings that Mother is engaged in weaponization in an effort to obtain[] advantage in the custody proceeding.

Trial Court Opinion in Support of Final Order of Custody, 9/20/24, at 6, 12.

*See also id.* at 2 ("The court also unequivocally believes that Mother has weaponized not only the PFA process[,] but has attempted to weaponize the ICC process[,] and, most alarmingly, is weaponizing the child abuse process.").[4]

_____

[4] On that same day that the court issued its final custody order, Judge Stambaugh issued an appendix "hereby incorporat[ing certain provisions] into the [c]ourt's September 10, 2024 [f]inal [o]rder of [c]ustody [f]ollowing [t]rial." Appendix A to Final Order of Custody, 9/20/24, at 1. Those provisions addressed issues relating to: shared legal custody; "summer" defined; summer vacation; notice of summer vacation; alternate holidays; Christmas; Mother's Day and Father's Day; Holidays; extracurricular activities; telephone calls/video calls; disparaging remarks; financial care of Child; mutual consultation; emergency decisions/illness of Child; welfare of Child to be considered; modification of order; and relocation. *See id.* at 1-9.

Mother filed a timely notice of appeal from the final custody order and contemporaneous Pa.R.A.P. 1925 concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i).

On appeal, Mother presents the following issues for our consideration:

(1) Whether a court may [*sua sponte*] issue a mandatory injunction compelling speech absent notice, without satisfying Pennsylvania Rule[] of Civil Procedure 1531, and without evidence overcoming a presumption of unconstitutionality?

(2) Whether the trial court erred in placing di[s]positive significance on a non-enumerated [custody] factor, disregarding mandatory "substantial" weighting under Kayden's Law,[5] and treating such as being determinative of most other factors?

(3) Whether the trial court erred by failing to consider and address relevant and up-to-date objective and disinterested testimony regarding [Father's] drug use and abuse?

Mother's Brief, at 11.

"Our paramount concern in child custody cases is the best interest of the child." *M.A.T. v. G.S.T.*, 989 A.2d 11, 19 n.9 (Pa. Super. 2010) (en banc) (citation omitted). Our standard of review of custody matters is as follows:

---

[5] Kayden's Law refers to a Pennsylvania Senate Bill that amended section 5328(a) by introducing new language into subsection 5328(a)(8), concerning "[t]he attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safely measures are necessary to protect the safety of the child." 23 Pa.C.S.A. § 5328(a)(8). The new language provides that one party's "reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party." *Id.*

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law[] or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

[Moreover,] the discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (citation omitted).

Finally,

[a]lthough we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

*M.A.T.*, 989 A.2d at 18-19 (citations omitted).

Mother first argues that the Disclaimer is a mandatory injunction which equates to an unlawful imposition on compelled speech. We find this claim waived.

- 7 -

In her Rule 1925(b) statement, Mother raised the following issue with regard to the Disclaimer:

The trial court issued an order directing Mother [] to make a statement to future health care and law enforcement providers about her credibility when future care of [C]hild is necessary and required, which violates [Mother's] civil rights and severely hinders [Mother's] ability to protect herself and [C]hild.

Notice of Appeal/Rule 1925(b) Statement,[6] 10/21/24, at 2 (unpaginated). Because Mother did not raise or even suggest a free speech claim in her Rule 1925(b) statement, the issue is waived on appeal. *See* Pa.R.A.P. (b)(4)(vii); *see also In the Interest of: G.D. v. D.D.*, 61 A.3d 1031, 1036 n.3 (Pa. Super. 2013) (where *pro se* appellant raises issue in appellate brief that is not raised in Rule 1925(a)(2)(i) statement, this Court may find waiver).[7]

In her next issue, Mother contends that the trial court erred in placing "dispositive significance on a non-enumerated [custody] factor" in coming to

_____

[6] *See* Pa.R.A.P. 1925(a)(2)(i) (in children's fast track appeals, "concise statement of errors complained of on appeal shall be filed and served with [] notice of appeal").

[7] However, even if we did not find this issue waived, Mother would not be entitled to relief. First Amendment protections historically encompass prohibitions on speech as opposed to compelled speech. *See In the Int. of J.J.M.*, 265 A.3d 246, 253 (Pa. 2021) ("First Amendment 'made applicable to the States through the Fourteenth Amendment, provides that 'Congress shall make no law . . . abridging the freedom of speech.'"); *citing* U.S. CONST. amend. I. In any event, the court was justified in requiring Mother to disclose the information contained within the Disclaimer where it bears directly upon "the important governmental interest of protecting the psychological and emotional well-being of Child[.]" *S.B. V. S.S.*, 243 A.3d 90, 113 (Pa. 2020).

its final custody determination.[8]  Mother's Brief, at 34.  In particular, Mother

claims that instead of properly considering all of the statutory custody factors,

_____

[8] Section 5328 enumerates a non-exclusive list of factors that a trial court must consider before making any custody determination.  Those factors are:

> **(a) Factors. --** In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1), and (2.2)[,] which affect the safety of the child, including the following:

> (1) Which party is more likely to ensure the safety of the child.

> (2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.

> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

> (2.2) Violent or assaultive behavior committed by a party.

> (2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

> (3) The parental duties performed by each party on behalf of the child.

> (4) The need for stability and continuity in the child's education, family life[,] and community life, except if changes are necessary to protect the safety of the child or a party.

> (5) The availability of extended family.

> (6) The child's sibling relationships.

*(Footnote Continued Next Page)*

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity[,] and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child.  A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party.  A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent[,] and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational[,] and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. §§ 5328(a)(1)-(16).  Moreover, under subsections 5328(a.1) and

(a.2):

*(Footnote Continued Next Page)*

"the trial court zeroed in on one fact: that [M]other weaponized the abuse reporting process." *Id.* at 37. Moreover, she asserts that instead of properly weighing this fact under custody factor eight or sixteen, *id.* at 38, "the trial court treated the weaponization as dispositive as to virtually every factor." *Id.* Had the court properly weighed the factors, Mother claims that the custody factors would have tipped in her favor. *Id.*

Instantly, we find that the trial judge carefully analyzed and addressed each of the subsection 5328 custody factors in light of the evidence presented at trial. *See id.* at 3-12. The trial court found Father "to be the more credible of the two [parents]." Trial Court Opinion in Support of Final Order of Custody, 9/20/24, at 2. Following two days of testimony, the trial court set forth its factual findings underlying its final custody decision, noting it "consider[ed] the Kayden's Law factors that[,] of course[,] guide the [c]ourt's decision [and

---

**(a.1) Exception.** -- **A factor under subsection (a) shall not be adversely weighed against a party if the circumstances related to the factor were in response to abuse or necessary to protect the child or the abused party from harm and the party alleging abuse does not pose a risk to the safety of the child at the time of the custody hearing.** Temporary housing instability as a result of abuse shall not be considered against the party alleging abuse.

**(a.2) Determination.** -- No single factor under subsection (a) shall by itself be determinative in the awarding of custody. The court shall examine the totality of the circumstances, giving weighted consideration to the factors that affect the safety of the child, when issuing a custody order that is in the best interest of the child.

*Id.* at §§ 5328(a.1)-(a.2) (emphasis in original and added).

- 11 -

stated that it] ha[d] given substantial weighted consideration to [f]actor 1, [f]actor 2.1, and [f]actor 2.2[,] as required by Kaden's Law." *Id.* at 3.[9]

With regard to the first of three factors that the court gave "substantial weighted consideration" in response to Kayden's Law, the court concluded that, while it believed both parties could ensure Child's safety and weighed factor 1 equally between the parties, the court was concerned about Mother's past attempts to use the PFA and ICC as weapons against Father, which "ultimately could lead to less contact with Father." *Id.* at 4. With regard to the second factor, factor 2.1—information set forth in subsection 5329.1(a) (relating to consideration of child abuse and involvement with protective services)—the court noted it was "deeply troubled" by Mother's reports that Father had abused Child, classifying her actions as "wild allegations in order to drive child abuse investigations . . . in an effort to affect custody[.]" *Id.* at 5. In conjunction with its conclusions under factor 2.1., the court referenced the Disclaimer and noted that it must be stated in any further child abuse reports Mother may make against Father. *Id.* Again, the court found this factor "weighed heavily" in Father's favor. *Id.* at 6. Finally, with regard to the third heavily weighed factor, factor 2.2—violent or assaultive behavior committed by a party—the court found this factor did not weigh in favor of

---

[9] The court weighed factor 2—present and past abuse committed by a party— "heavily in Father's favor." *Id.* at 5. The court noted that with regard to the 2023 PFA incident, Mother had produced no evidence to support a claim of abuse against Father and that her "multiple attempts at [indirect criminal contempt] violations . . . were simply baseless." *Id.*

either party. The court noted, however, that there were no allegations of violent or assaultive behavior committed by Mother, that it found "no factual basis for any long[-]term ongoing concerns of violence or assaultive behavior by Father[, and that] Father tested very low with regard[] to any anger issues." *Id.*

Under custody factor 8, which includes the new Kayden's Law language, the court determined that Mother's concerns for Child's safety, vis-à-vis Father's alleged abuse, were not reasonable. *See id.* at 10 (court noting it found Mother's evidence that Father tried to turn Child against her not credible). Thus, the court was not precluded from considering Mother's efforts as an attempt to turn Child against Father. Even so, the court did not find that factor 8 weighed in favor of either party. *Id.* at 9-10.

Notably, Mother acknowledges that she is "unable to point to any case [that] has addressed the exact error" stated in her second issue on appeal. Mother's Brief, at 36. As a result, Mother's argument contains no citation to case law. *See* Pa.R.A.P. 2119(b). In fact, Mother's challenges to the trial court's final custody determination are tantamount to an invitation to this Court to reweigh the custody factors, reassess the evidence, and second-guess the court's credibility determinations. We are prohibited from doing any of those things on appeal. *See King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005) (citation omitted) ("It is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given [sic] due deference to the trial court's

- 13 -

weight and credibility determinations,' the trial court erred or abused its discretion[.]").

After a review of the record, we conclude that the court's findings and determinations are supported by competent evidence of record and will not disturb them where the court's consideration of the custody factors was in Child's best interest. *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013) ("It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case.") (citation omitted). There was no abuse of discretion. *M.A.T.*, *supra*.

In her final issue, Mother contends that the trial court erred by failing to consider evidence of Father's drug use and abuse when determining whether Father had failed to comply with current and previous PFA orders. Thus, Mother claims, the final custody order does not protect Child's best interest, safety, and well-being. Specifically, Mother asserts that Father "purposefully subverted a urinalysis, refused to take a follicle test, and had results which were indicative of adulteration."[10] Mother's Brief, at 47.

In her argument, Mother claims that the trial court chose to "simply ignore" the truth and, instead, "chose to accept [Father's] interested and [] dubious testimony," rather than "conduct[ing] a searching inquiry into relevant issues including drug and alcohol abuse." *Id.* at 46. Father's expert, Jonathan M. Gransee, Psy.D., a licensed psychologist, issued an expert report

---

[10] According to Mother, heightened creatine levels are indicative of adulterating urinalysis test results.

that stated Father was self-employed and lived in two different places from September 2023 through July 2024. On cross-examination, however, Mother's attorney pointed out that Father had actually testified he was **un**employed, had lived in three different places from September 2023 through July 2024, and did not disclose to Dr. Gransee that he had taken anger management classes in the past. *See* N.T. Custody Trial, 9/10/24, at 193-94. Doctor Gransee testified that, based on the information Father did not provide him to prepare his report, "it would certainly bring into question [Father's] stability . . . or [his] concerns related to [Father's] drug use[.]" *Id.* at 194-96. Doctor Gransee reiterated that in his report, he concluded Father "may have sometimes overused [] Adderall . . . [and that] it's possible that he had taken more than he was prescribed." *Id.* at 196. To address those concerns, Dr. Gransee testified that Father should only be prescribed his medication from one doctor and that he should be getting a periodic urine or hair follicle test to confirm the "expected levels [of Adderall] to make sure that they were consistent." *Id.*

On redirect examination, Dr. Gransee testified that he saw nothing that suggested Father was taking his Adderall "outside of normal therapeutic levels." *Id.* at 197-98. Moreover, on recross examination, Mother's expert, Lawernce Guzzardi, M.D., an emergency physician and medical toxicologist, testified that due to a nationwide Adderall shortage, it was possible Father had rationed his ADHD medications which could have validly explained Father's "unusual pattern of drug use" and explained Father's positive amphetamine

- 15 -

result in his hair follicle test. *Id.* at 201-03. At the conclusion of Dr. Guzzardi's testimony, the trial judge noted that "Dr. Swords has [Father] on a non[-]fillable prescription of [Zolpidem, that Father] gets a monthly evaluation prior to getting another prescription[, and that the judge is] on top of it." *Id.* at 205. Finally, Dr. Gransee's expert report concluded that Father has a history of abusing opioids and gave Father "a diagnosis of Opioid Use Disorder, **In Full Sustained Remission**, On Agonist Therapy." Psychological Evaluation of Billy Peterson by Jonathan M. Gransee, Psy.D., 12/13/23, at 23 (emphasis added).

In its opinion, the court made the following conclusion regarding Father's "history of drug and alcohol abuse" as it relates to custody factor 14:

> The [c]ourt heard a lot of testimony from both parties over this point. Whatever might have been in the past, the [c]ourt is satisfied it's long enough in the past that it's no longer a concern. I see no basis for any ongoing drug or alcohol monitoring of either party.

Trial Court Opinion in Support of Final Order for Custody, 11/19/24, at 11. In his final report, Dr. Gransee stated that "[Father] does not present as an individual in need of drug and alcohol treatment at this time. [Father] did have an issue with opioids in the past, but he has this under control with the use of Suboxone, and does have a plan to gradually eliminate this medication." Psychological Evaluation of Billy Peterson by Jonathan M. Gransee, Psy.D., 12/13/23, at 25. While Dr. Gransee indicated that "it seems that [Father] should continue to be monitored" with regard to his administering of Adderall, "it does not seem that a high level of intervention is needed." *Id.*

Again, Mother attempts to have us reassess the court's determination that Father no longer needs constant drug monitoring where expert testimony reveals that Father is in sustained remission and that any past opioid abuse is now under control. A review of the record reveals that the court did conduct a thoughtful and considered analysis of the issues surrounding Father's drug abuse history, including the testimony of Mother's expert and Father's past uranalysis and follicle test results, and came to an objective conclusion with regard to factor 14. We will not disturb that finding where it was neither an abuse of discretion or manifestly unreasonable based on the record evidence. **M.A.T.**, **supra**.

Order affirmed.

Lane, J., Concurs in the Result.

Bowes, J., Files a Concurring and Dissenting Memorandum.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/01/2025